888 P.2d 1354

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Plaintiff–Appellee,**

v.

**Paul ASH and Elaine Ash, husband and wife, Defendants–Appellants.**

No. 1 CA–CV 92–0356.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 18, 1994.

Review Denied Feb. 22, 1995.

O'Connor, Cavanaugh, Anderson, Westover Killingsworth & Beshears, P.A. by Ralph E. Hunsaker, Frank M. Fox, Christopher Robbins, Phoenix, for plaintiff-appellee.

Begam, Lewis, Marks, Wolfe & Dasse, P.A. by Robert G. Begam, Paul A. Jozef, Cora Perez, Phoenix, for defendants-appellants.

## OPINION

GERBER, Judge.

Paul Ash and Elaine Ash (the Ashes) appeal from the trial court's grant of summary judgment in favor of State Farm Mutual Automobile Insurance Company (State Farm) determining that the underinsured motorist (UIM) coverage limits under their two automobile policies were $15,000/$30,000. The appeal raises the following issues:

(1) Whether the trial court erred in holding that Ariz.Rev.Stat.Ann. (A.R.S.) section 20–259.01(C) (1981) did not require State Farm to make written offers of UIM coverage in limits up to the bodily injury liability limits of its existing insureds' policies upon offering to renew such policies;

(2) Assuming A.R.S. section 20–259.01(C) mandated such offers, whether State Farm

was required to prove that its insureds actually received and expressly rejected them;

(3) Whether there was a genuine issue of material fact regarding whether State Farm actually sent the Ashes an offer to increase the UIM limits of their policy; and

(4) Whether the written materials allegedly sent by State Farm to the Ashes complied with the written offer requirement of A.R.S. section 20–259.01(C).

We have jurisdiction pursuant to A.R.S. section 12–2101(B). For reasons which follow, we hold that (1) State Farm was required to make written offers of increased UIM coverage under A.R.S. section 20–259.01(C) to all current automobile liability policyholders upon renewal; (2) A.R.S. section 20–259.01(C) did not require State Farm to prove the Ashes' actual receipt of the written offer or their express rejection of it; (3) no triable issue of fact existed regarding whether State Farm "offer[ed]" expanded UIM coverage "by written notice" within the statute; and (4) as a matter of law, the substance of the written offer sent by State Farm was adequate to comply with A.R.S. section 20–259.01(C). We therefore affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

The Ashes bought two automobile insurance policies from State Farm in 1965. They retained those policies thereafter, transferring coverage to replacement vehicles from time to time. Each policy was subject to renewal every six months.

Effective July 25, 1981, 1981 Ariz.Sess. Laws Ch. 224, § 1 amended A.R.S. section 20–259.01 to require all automobile liability or motor vehicle liability policies issued or delivered in Arizona to provide UIM coverage in not less than the limits prescribed by A.R.S. section 28–1102.[1] A.R.S. section 20–259.01(C) (1981) provided:

C. Every insurer writing automobile liability or motor vehicle liability policies, as

provided in subsection A of this section shall also make available to the named insured thereunder and shall by written notice offer the insured and at the request of the insured shall include within the policy underinsurance motorist coverage which extends to and covers all persons insured under the policy, in limits not less than the liability limits for bodily injury or death contained within the policy.

After the effective date of the 1981 amendment, State Farm sent the renewal notice to each of its Arizona insureds with an offer to increase UIM limits up to the policy's bodily injury liability limits. Under this procedure, the computer that printed the renewal notices automatically individualized one of four prepared messages according to the information in its memory concerning the particular policy. It then printed the appropriate message on the renewal notice.

Under this procedure, the renewal notice sent to the Ashes in January 1982 would have included the following passage:

*U less than BI, No W*

NEW STATE LAW CHANGES UNINSURED MOTOR VEHICLE, COVERAGE U, AND REQUIRES UNDERINSURED MOTOR VEHICLE, COVERAGE W. SEE INSERT FOR DETAILS.

COVERAGE W HAS BEEN ADDED TO YOUR POLICY AT LIMITS OF 15/30.

IF YOU WOULD LIKE U AND W COVERAGE EQUAL TO YOUR BODILY INJURY LIABILITY LIMITS OF XXX/XXX, CHECK HERE ___ AND PAY $XXXX.XX.

IF DIFFERENT LIMITS ARE DESIRED, PLEASE CONTACT YOUR AGENT.

PLEASE RETURN THIS HALF OF THE NOTICE WITH YOUR PAYMENT.

Immediately above and to the right of this text would have been a box stating "Please Return this Part with Your Check Made

---

1. Those limits have been $15,000/$30,000 since 1972. Ariz.Sess.Laws Ch. 157, § 6.

Payable to State Farm," the due date, and the words "Please Pay this Amount $XXXX.XX."

In place of the Xs in the third paragraph, the computer automatically entered the insured's actual bodily injury liability limits and the total amount due for all coverages if the insured were to select the higher limits of uninsured motorist and UIM coverage. If for any given renewal notice the computer lacked information needed to fill in the blanks for existing policy limits or appropriate premiums, it added the policy to a list of those that it could not bill automatically. Each of these policies was then reviewed individually and the appropriate information entered into the computer so that the renewal notices could be printed accurately.

After the new procedure was in place, State Farm personnel inspected each individual billing notice generated over the first day of operation for accuracy in order to determine whether the computer system was set up correctly. Thereafter, each billing notice was not individually reviewed. Barbara Ward, a State Farm underwriter, testified on deposition:

Q. BY MR. JOZEF: So there are no documents that we can go to at this point to determine whether the Ashes' premium notice during that 12–month period was one which would not print up automatically with those X's filled in?

A. It would not—to my knowledge, there would not be a need for it to print out on a separate listing because it did not have anything unusual about the policy form and policy limits. That would prevent it from automatically billing.

Q. I understand your point. But if we wanted to go and find the listing and see whether either the Ashes—

A. No, those documents are not retained.

After July 25, 1981, State Farm's procedure for sending renewal notices included machine-insertion of a brochure into the envelope containing each notice. The information portion of the brochure stated:

Because of a new Arizona law, Underinsured Motor Vehicle Coverage (Coverage W) is being added to your policy effective on your renewal date. This coverage is mandatory and cannot be rejected. Please read the following endorsement and place it with your policy.

. . . . .

If you're involved in an accident for which the other driver is at fault and injuries to you and your passengers exceed the other driver's Bodily Injury Liability limits, Coverage W takes over. It provides protection up to $15,000 per person/$30,000 per accident in excess of the other driver's Bodily Injury Liability limits. A premium adjustment has been made for the added protection provided by Coverage W.

The new law also requires that we offer you the opportunity to increase both your Uninsured Motor Vehicle Coverage and Underinsured Motor Vehicle Coverage limits to be equal to the limits of your Bodily Injury Liability Coverage. Your Premium Notice may include instructions on increasing these limits.

If you have any questions or would like information on other limits that are available for Uninsured, Underinsured and Liability Coverages, please contact your agent.

As of 1981, State Farm had approximately 300,000 to 400,000 automobile liability policies with its insureds in Arizona. State Farm's files contain nothing to indicate that the Ashes actually received an offer to increase their UIM coverage on their renewal notice, to indicate what numbers, if any, were printed on their notice, or to demonstrate that they affirmatively rejected higher UIM limits. Paul Ash's affidavit stated: "I do not recall ever receiving from State Farm an offer to increase my underinsured motorist coverage limits up to an amount equal to my liability limits of $100,000/$300,000." He also testified:

Q. Did you receive premium notices on a monthly basis, yearly basis, quarterly basis from State Farm?

A. I can't recall how often I received premium notices, but they were sometimes forwarded from Arizona to Los Angeles, and when I got them I would pay them. I would open them up or my wife would open them up; I would read the contents and pay them.

Q. And any time that you received a premium notice you reviewed it and paid it?

A. Yeah.

Q. There was never a time when you didn't pay a premium, to your knowledge?

A. One time I think we didn't get the mail and then we received a notice that the policies would be canceled unless, you know, the premiums were paid, and we always paid. But it could be that for one reason or another the bill got lost or misplaced or whatever. So when we did get that notice, obviously we did pay it then.

Q. So you got the follow-up notice and at that point you did pay it?

A. Oh yes.

Q. Any other time that you are aware of that you did not receive the premium notice or had problems paying the premium?

A. No. That could have happened maybe two or three times over the last 16 or so years.

After the 1981 amendment to A.R.S. section 20–259.01, both the Ash policies included "Underinsured Motor Vehicle—Coverage W" with limits of $15,000/$30,000. The limits of bodily injury liability under each policy were $100,000/$300,000.

On September 21, 1989, Elaine Ash was involved in an automobile accident. She collected $100,000 in liability coverage from the adverse driver's insurance policy. Because her losses from the accident exceeded that amount, the Ashes demanded UIM benefits of $100,000 under each of their State Farm policies.

State Farm commenced this declaratory judgment action to obtain a judicial determination that each of the Ashes' policies contained UIM limits of $15,000/30,000. On cross-motions for summary judgment, the trial court ruled for State Farm. The court held that A.R.S. section 20–259.01(C) did not require insurers to send written offers of UIM coverage up to bodily injury liability limits to existing policyholders. The court also held that the notice State Farm sent out under its business practice was sufficient on its face and that no acknowledgment or signed return was required by the statute in any event.

The Ashes timely appealed.

## DISCUSSION

### REQUIREMENT OF WRITTEN OFFER ON POLICY RENEWAL

We first address the Ashes' contention that the trial court erred in holding that A.R.S. section 20–259.01(C) did not require insurers to offer increased UIM coverage in writing to their existing insureds upon renewal of their policies.

The trial court based its holding on *dictum* in our decision in *Stuart v. Insurance Co. of North America,* 152 Ariz. 78, 730 P.2d 255 (App.1986). In that case, the insured appellant's automobile policy provided $500,000 liability coverage and $100,000 UIM coverage. About two weeks before the appellant's wife was killed in an accident with an underinsured motorist, the 1981 amendment to A.R.S. section 20–259.01 became effective. The only question actually before us in *Stuart* was whether the insurer had been required to offer expanded UIM limits as of the effective date of the amendment, during the term of the appellant's existing policy. Based on the legislative history of A.R.S. section 20–259.01(C), we held it was not. *Id.* at 79, 84, 730 P.2d at 256, 261.

In *Stuart,* we also expressed the view that the following year's amendment to subsection C, newly providing that the offer "need not be made in the event of reinstatement of a lapsed policy or the transfer, substitution, modification or renewal of an existing policy," was likely intended to reinforce the original

intent of the 1981 amendment to exclude existing insureds from the insurers' duty to offer increased UIM limits. *Id.* at 82–83, 730 P.2d at 259–60. We stated:

> Given the focus of the pre-amendment statute . . ., we hold that the language in question was intended only to require insurers **to offer their new automobile liability policy customers,** affirmatively and in writing, uninsured and underinsured motorist coverage with limits up to those selected for bodily injury liability coverage. There is no indication the language was intended to impose the same requirement with respect to existing policyholders as well.

*Id.* at 83, 730 P.2d at 260 (emphasis added).

We did not have occasion in *Stuart* to discuss the implications of our reasoning as applied to policy renewals. For that reason and those we discuss below, we find it appropriate to follow only *Stuart*'s holding, namely that A.R.S. section 20–259.01(C) did not require insurers to make mid-term offers of increased UIM coverage to holders of continuing, unexpired automobile policies as of the effective date of the 1981 amendment. We conclude that the trial court erred in interpreting *Stuart* on the issue of policy renewals.

■ The legislature's objective in enacting the 1981 amendment was to ensure that all persons who purchase automobile liability insurance be offered in writing the option to purchase additional UM and UIM coverage in limits up to those they choose for their bodily injury liability coverage. Existing policyholders whose policies expire and who elect to continue their coverage by paying the premium billed on the insurer's renewal notice are purchasers of such insurance to the same extent as persons who purchase new policies. *See DeTemple v. Southern Ins. Co.,* 154 Ariz. 79, 81, 740 P.2d 500, 502 (App. 1987) (automobile policy renewal notices constituted offer to provide new policy upon payment of premium by date certain); *Knight v. State Farm Mut. Auto. Ins. Co.,* 297 S.C. 20, 374 S.E.2d 520, 522 (App.1988)

(general rule is that renewal of insurance policy for fixed term is in effect a new contract); *Courville v. State Farm Mut. Auto. Ins. Co.,* 386 So.2d 176, 177–78 (La.App.1980) (initial insurance contract is limited to its specified term; each renewal is separate contract though new policy not issued), *aff'd in part, rev'd in part on other grounds,* 393 So.2d 703 (La.1981). Further, nothing in the history of the 1981 amendment suggests that the legislature intended to discriminate between the class of insureds purchasing new policies and that of insureds renewing existing ones.

*Stuart* expressed the view that the 1982 amendment, which dispensed with the requirement that expanded UIM limits be offered in the case of lapsed, transferred, substituted, modified or renewed policies, was likely intended to "reinforce that the original intent of the 1981 amendment was to exclude existing insureds." 152 Ariz. at 83, 730 P.2d at 260. State Farm relies on this language to support its contention that the 1982 amendment merely clarified and confirmed the inapplicability of A.R.S. section 20–259.01(C) to policy renewals.

■ We disagree. In our opinion, the 1982 amendment may be more logically explained as a move to relieve insurers of the administrative burden of needlessly sending duplicative notices concerning increased UIM coverage to insureds to whom notices had already been sent. Automobile liability policies generally have a term of one year or less. If offers of increased UIM coverage were given to all new and renewing insureds during the first year following the effective date of the 1981 amendment, all persons insured under automobile liability policies would have been notified of their right to purchase such coverage in a year's time. There would therefore have been no reason to continue to extend such offers to renewing insureds after July 24, 1982. The 1982 amendment eliminated the need for such superfluous efforts. We think it was likely intended for just that purpose and no other.

■ Accordingly, we hold that before the effective date of the 1982 amendment, A.R.S.

section 20–259.01(C) (1981) required insurers to offer expanded UIM limits to both new and renewal insureds. Contrary to the trial court's holding, State Farm was therefore required to make a written offer of such expanded limits to the Ashes upon the renewal of their policies.

ACTUAL RECEIPT; EXPRESS REJECTION

We next consider the Ashes' contention that State Farm was required to prove that they actually received and expressly rejected a written offer of increased UIM limits in connection with their January 1982 policy renewals. As direct authority for that proposition, appellants cite *Giley v. Liberty Mutual Fire Insurance Co.*, 168 Ariz. 306, 812 P.2d 1124 (App.1991).

■ *Giley* does not support this interpretation. There, the insured appellant testified that her agent failed to mention UIM coverage to her. Instead, he handed her a form, asked her to sign it if she wanted coverage, and then kept it in the company files. Reversing summary judgment for the insurer, Division Two stated:

> First, the phrase "make available" requires that the insurer offer such coverage in a way reasonably calculated to bring to the insured's attention that which is being offered. If [insured's] testimony is credited, the agent did not do so. Second, handing a form to her, asking her to sign it if she wants coverage, and then retaining the form is, in fact, conduct likely to prevent [insured] from reading the form. A trier could reasonably conclude that the Liberty Mutual agent, intentionally or negligently, engaged in conduct that did not make underinsured coverage available and did not by written notice offer such coverage because the insured was led to believe she was simply signing an application for insurance.

*Id.* at 306–07, 812 P.2d at 1124–25 (emphasis added). Proving actual receipt of a written offer of increased UIM coverage would likely be sufficient to show it was offered "in a way reasonably calculated to bring to the insured's attention that which is being offered." But proving actual receipt is not the only way by which the *Giley* standard may be met, and *Giley* does not hold otherwise.

■ Further, *Giley* does not hold that the insurer must prove that the insured expressly rejected its offer. This conclusion is not surprising because such a holding would conflict with the statute's express language. A.R.S. section 20–259.01(C) provides that the insurer "shall by written notice offer the insured and **at the request of the insured shall include within the policy underinsurance motorist coverage....**" (Emphasis added.) The insurer need only make the written offer. The insured must then request that the offered coverage be included in his policy. No express rejection is required. The decisions on which the Ashes rely either do not support their thesis or are based on statutory language that differs from Arizona's.[2]

FACT ISSUE RE MAKING OF "OFFER" "BY WRITTEN NOTICE"

The Ashes also argue in their opening brief:

> State Farm sends out generic notices and assumes the insured does not want increased UIM coverage unless he or she affirmatively requests it. There is no evidence that insureds actually receive the notice, read it, understand it, and make a knowing acceptance or rejection of UIM coverage. The insurance companies never follow-up.
>
> . . . .
>
> At a minimum, there is an issue of fact for the jury as to whether the Ashes received and rejected a UIM offer. The Ashes do not recall ever receiving the of-

2. *Walsh v. State Farm Mut. Auto. Ins. Co.*, 624 F.Supp. 1093 (D.Del.1985); *Holman v. All Nation Ins. Co.*, 288 N.W.2d 244 (Minn.1980) (superseded by statute); *Knight v. State Farm Mut. Auto. Ins. Co.*, 297 S.C. 20, 374 S.E.2d 520 (1988); *Grange Ins. Ass'n v. Great American Ins. Co.*, 89 Wash.2d 710, 575 P.2d 235 (1978).

fer. State Farm's "general practice" is highly suspect. It was all done mechanically, with no supervision. The entire procedure of sending the notice was monitored by a human being for only one day.

To the extent the Ashes implicitly contend that the record reveals a triable fact issue on whether State Farm complied with the requirement that it "offer" increased UIM coverage by written notice, we disagree.

■ A motion for summary judgment "should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). State Farm presented evidence concerning the computer-mechanized method by which it sent policy renewal notices and explanatory brochures to its policyholders in 1981–82. This evidence was relevant and admissible pursuant to Rule 406, Arizona Rules of Evidence.[3] Further, State Farm's evidence supported the proposition that the required written offer of expanded UIM limits was printed on each insured's renewal notice.

■ The Ashes freely admit paying all their renewal premiums. The only evidence on which they rely to raise doubt that the required written offer was actually sent to them is their testimony that they did not recall receiving any offer to increase UIM coverage. Failure to remember an alleged event supported by evidence of routine practice is not sufficient to raise a fact issue precluding summary judgment. *Dorrance v. Valley National Bank,* 165 Ariz. 162, 164, 797 P.2d 701, 703 (App.1990). *See Taruc v. State Farm Mut. Auto. Ins. Co.,* 218 Ill. App.3d 51, 161 Ill.Dec. 7, 12–13, 578 N.E.2d 134, 139–40 (1991) (insured's failure to remember discussion with insurance agent

whose routine business practice was to inform customers of right to increase UIM limits was insufficient to defeat summary judgment for insurer).

The cases on which the Ashes rely do not support their contention. In *Dewart v. State Farm Mutual Automobile Insurance Co.,* the offer in question was inadequate not because it was sent by a computerized mechanical process but because it provided no explanation of underinsured motorist coverage. 296 S.C. 150, 370 S.E.2d 915, 918 (App.1988). Here, State Farm's evidence of routine business practice included testimony that a brochure clearly explaining UIM coverage was sent to all policyholders with their renewal notices. In *Walsh v. State Farm Mutual Automobile Insurance Co.,* the district court treated counsel's avowals that his clients did not remember receiving specific price quotations in their UIM offer as equivalent to "specific testimony of non-receipt." 624 F.Supp. 1093, 1099–100 (D.Del.1985). We disagree with that court's determination. In *American Motorists Insurance Co. v. Weingarten,* the court affirmed summary judgment for the insured, holding that the statutorily required "informed rejection" of additional uninsured motorist coverage could not, without extrinsic evidence, be implied from the insured's signature on an application for uninsured motorist coverage at lower limits. 355 So.2d 821 (Fla.App.1978). This decision is factually and legally inapposite.

### Sufficiency of State Farm's Offer of Increased UIM Limits

Finally, the Ashes contend that the substance of State Farm's written offer of increased UIM coverage was insufficient as a matter of law to comply with A.R.S. section 20–259.01(C). To support their argument, they rely on *Hastings v. United Pacific Insurance Co.,* which adopted the following minimal requirements for an adequate mandatory offer of optional coverage:

---

**3.** Rule 406 provides:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

(1) notification must be commercially reasonable if the offer is made in other than face-to-face negotiations;

(2) the insurer must specify the limits of the optional coverage and not merely offer additional coverage in general terms;

(3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and

(4) the insurer must advise the insured that the optional coverage is available for a relatively modest premium increase.

318 N.W.2d 849, 851–53 (Minn.1982). They contend that State Farm's written offer failed *Hastings'* last two requirements for the following reasons: its two-document format was confusing; it was unclear that an offer was actually being made; and State Farm was unable to produce specific evidence that the coverage was being offered for a modest charge.

 Although Arizona has not adopted *Hastings* requirements, we find that State Farm's offer met those criteria. The offer specifically stated: "IF YOU WOULD LIKE U AND W COVERAGE EQUAL TO YOUR BODILY INJURY LIABILITY LIMITS OF XXX/XXX, CHECK HERE ____ AND PAY $XXXX.XX." This language was clearly an offer. Further, the premium notice stated, "SEE INSERT FOR DETAILS," unambiguously referring the insured to a brochure which succinctly explained:

> If you're involved in an accident for which the other driver is at fault and injuries to you and your passengers exceed the other driver's Bodily Injury Liability limits, Coverage W takes over. It provides protection up to $15,000 per person/$30,000 per accident in excess of the other driver's Bodily Injury Liability limits.... The new law also requires that we offer you the opportunity to increase both your Uninsured Motor Vehicle Coverage and Underinsured Motor Vehicle Coverage limits to be equal to the limits of your Bodily Injury Liability Coverage. Your Premium Notice may include instructions on increasing these limits.

Because the Ash renewal notice included instructions on increasing UIM limits, as the brochure said it might, there was nothing unclear or confusing about this explanation.

Moreover, Barbara Ward testified without contradiction that State Farm's computer program was designed to replace the Xs in the renewal notice text with the appropriate policy limits and premium information for the policy in question. She further stated that an entire day's run had been individually checked to determine that the program was operating properly and that the Ash policy did not have anything unusual about the policy form and policy limits that would prevent it from automatically billing. Finally, contrary to the Ash argument, the premium notice text was not set up so as to lead the policyholder to conclude that increased UIM limits would cost an additional sum exceeding the normal policy premium. The text made it sufficiently clear that the policyholder was either to pay the figure displayed in the box if there was no wish to add coverage, or alternatively, to pay the figure printed in the UIM notice.

### *CONCLUSION*

State Farm complied with A.R.S. section 20–259.01(C) in connection with the Ashes' 1981–82 premium renewal notice. The trial court correctly granted summary judgment to State Farm.

State Farm requests an award of attorneys' fees on appeal pursuant to A.R.S. section 12–341.01. In the exercise of our discretion, we deny the request.

The trial court's judgment is affirmed.

EHRLICH, P.J., and McGREGOR, J., concur.